UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

RUSSEL J. GANNARD, III

VERSUS

ISLAND OPERATING CO INC ET AL

CASE NO.  6:23-CV-00993

JUDGE ROBERT R. SUMMERHAYS

MAGISTRATE JUDGE DAVID J. AYO

RULING

Before the Court is a Motion for Summary Judgment [ECF No. 37] filed by Quality Production Management, LLC ("QPM") and a Motion for Summary Judgment [ECF No. 44] filed by REC Marine Logistics, LLC ("REC Marine"). For the reasons that follow, QPM's summary judgment motion [ECF No. 37] is DENIED and REC Marine's summary judgment motion [ECF No. 44] is DENIED.

## I.
### BACKGROUND

Plaintiff Russel Gannard ("Gannard") was employed by Quality Construction and Production, LLC ("QCP") as a fitter and was assigned to perform construction work aboard a platform ("the Platform") owned by Arena Offshore, LP ("Arena").[1] REC Marine owned and operated the M/V GOL FORCE ("the Vessel") which housed QCP employees during the Platform construction work.[2] Gannard alleges that he was injured on April 28, 2023, while being transferred from the deck the Vessel to the Platform, by way of a crane on the Platform.[3] Gannard claims that while he was attempting to enter the "lift basket" to be transferred from the Vessel to the Platform, the basket briefly lost contact with the surface of the Vessel and then slammed back down onto the

---

[1] ECF No. 37-2 at 10-12; ECF No. 39-1 at 15.
[2] ECF No. 37-2 at 10.
[3] ECF No. 19 at 3-4.

1

deck, causing Gannard's leg to jam against the deck of the Vessel and resulting in an injury to his right knee.[4] Two prior personnel transfers were made successfully under the same conditions.[5]

After filing suit, Gannard learned in discovery that the crane operator, who he originally alleged was a co-employee of QCP, was actually an employee of a related entity named Quality Production Management, LLC ("QPM").[6] On June 2, 2025, Gannard filed a Second Amending and Supplemental Complaint, naming QPM as a defendant in addition to REC Marine.[7]

Gannard alleges that the loss of contact between the deck of the Vessel and the lift basket could only have occurred as the result of one of three possible actions: 1) the deckhand on duty, employed by REC Marine, failed to communicate to the crane operator, employed by QPM, the appropriate amount of slack needed in the line to account for sea conditions at the time of the incident, 2) the deckhand on duty failed to communicate to personnel, including Gannard, that the sea conditions rendered it unsafe to board the basket, or 3) the crane operator prematurely lifted the basket off of the Vessel before Gannard had fully boarded and then dropped the basket back down.[8] QPM and REC Marine have separately moved for summary judgment, each claiming that there is no evidence of negligence.

## II.
### SUMMARY JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought."[9] "The court shall grant summary

---

[4] *Id.*
[5] ECF No. 37-2 at 13-14.
[6] *See* ECF No. 17 at 1.
[7] ECF No. 19.
[8] *Id.* at 2.
[9] Fed. R. Civ. P. 56(a).

2

judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[10] "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party."[11] As summarized by the Fifth Circuit:

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. However, where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial.[12]

When reviewing evidence in connection with a motion for summary judgment, "the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached."[13] "Credibility determinations are not part of the summary judgment analysis."[14] Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof."[15]

---

[10] *Id.*

[11] *Quality Infusion Care, Inc. v. Health Care Service Corp.*, 628 F.3d 725, 728 (5th Cir. 2010).

[12] *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir.1994) (internal citations omitted).

[13] *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir.2001); *see also Feist v. Louisiana, Dept. of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (the court must view all facts and evidence in the light most favorable to the non-moving party).

[14] *Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 458 (5th Cir. 2002).

[15] *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004) (alterations in original) (quoting *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)).

## III.
### QPM's Motion for Summary Judgment

#### A. Applicable Law.

Gannard's complaint alleges that QPM was negligent under both general maritime law and Louisiana law. QPM argues that Gannard's claims against it are governed by Louisiana law because the Platform is located on the outer continental shelf ("OCS") and Louisiana is the state adjacent to the Platform. REC Marine does not argue choice of law and Gannard does not oppose the motion.

In determining which law governs the claims, the Court must first determine whether the claims "arise under OCSLA."[16] If that threshold is met, the court must employ OCSLA's choice of law test to determine whether adjacent state law applies as "surrogate federal law," or whether maritime law "applies of its own force."[17]

The Fifth Circuit applies a three-element "but for" analysis to determine if a tort cause of action arises under OCSLA: "(1) the facts underlying the complaint occurred on the proper situs; (2) the plaintiff's employment furthered mineral development on the OCS; and (3) the plaintiff's injury would not have occurred but for his employment."[18] Gannard was injured during a personnel basket transfer from a vessel to an offshore platform located on the OCS adjacent to the coast of Louisiana. Because OCSLA expressly applies to "artificial islands and fixed structures erected" on the OCS,[19] the first element is satisfied.[20] The second and third elements are also satisfied

---

[16] *See Barker v. Hercules Offshore, Inc.*, 713 F.3d 208, 213 (5th Cir. 2013).
[17] *See Union Texas Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990).
[18] *Barker*, 713 F.3d at 213.
[19] 43 U.S.C. § 1333(a)(2)(A).
[20] Gannard was in physical contact with the personnel basket attached to a crane on the Platform. *See Champagne v. Tetra Applied Techs. Inc.*, No. 05-299, 2006 WL 287985, at *3 (S.D. Tex. Feb. 6, 2006) (concluding that an accident occurred on an OCSLA situs where the injured platform worker "was

4

because Gannard's employment as a fitter furthered mineral development on the OCS and but for his employment with QCP to work on the Platform, he would not have been aboard the Vessel where the injury occurred.[21] Thus, Gannard's claims arise under OCSLA.

OCSLA "extends federal law to the subsoil and seabed of the [OCS] and all attachments thereon," and it adopts the adjacent state's laws as "surrogate federal law," to the extent the state's laws "'are applicable and not inconsistent with' other federal law."[22] For a state's laws to apply to a dispute arising under OCSLA, "(1) [t]he controversy must arise on a situs covered by OCSLA (i.e., the subsoil seabed, or artificial structure permanently or temporarily attached thereto);" "(2) [f]ederal maritime law must not apply of its own force;" and "(3) [t]he state law must not be inconsistent with federal law."[23] The first and third parts of this test are satisfied because the Platform is located in Louisiana's territorial waters and no party argues that Louisiana law is inconsistent with federal law. The only remaining question is whether maritime law applies of its own force.

For maritime law to apply in an OCSLA tort action, "an incident must have both a maritime situs and a connection to traditional maritime activity."[24] Assuming, *arguendo*, that the maritime situs requirement is met, the Court turns to the maritime connection requirement. A court must first

---

connected to the personnel basket at the time of the alleged injury and [ ] through the basket [ ] was physically connected to the crane and Exxon's platform"); *see also Hicks v. BP Expl. & Prod., Inc.*, 308 F. Supp. 3d 878, 884 (E.D. La. 2018).

[21] *See Hicks v. BP Expl. & Prod., Inc.*, 308 F. Supp. 3d 878, 884 (E.D. La. 2018) (holding that "Hicks would not have suffered his alleged injury but for his employment on the offshore platform."); *see also Debellefeuille v. Vastar Offshore, Inc.*, 139 F. Supp. 2d 821 (S.D. Tex. 2001).

[22] 43 U.S.C. § 1349(b)(1); *Kennedy v. Shell USA, Inc.*, No. CV 22-4591, 2024 WL 2863381, at *3 (E.D. La. June 6, 2024) (citing *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 604, 139 S. Ct. 1881, 1886, 204 L. Ed. 2d 165 (2019)).

[23] *Grand Isle Shipyard Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 784 n.3 (5th Cir. 2009) (en banc) (citing *Union Tex. Petroleum Corp. v. PLT Engineering, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990)).

[24] *Hufnagel v. Omega Serv. Indus., Inc.*, 182 F.3d 340, 351 (5th Cir. 1999).

"'assess the general features of the type of incident involved,' to determine whether the incident has 'a potentially disruptive impact on maritime commerce,'" and then must "determine whether 'the general character' of the 'activity giving rise to the incident' shows a 'substantial relationship to traditional maritime activity.'"[25]

In *Hicks*, the Eastern District of Louisiana held that an injury to a platform worker during a personnel basket transfer between an offshore platform and a vessel in navigable waters did not satisfy the traditional maritime activity prong.[26] Because the kind of activities performed on offshore platforms by platform workers fell "outside the purview of maritime navigational or commercial activities," the injuries to platform workers during personnel basket transfers on offshore platforms did not relate to traditional maritime activity.[27] Additionally, Fifth Circuit cases have applied adjacent state law to tort claims against platform owners involving personnel basket transfers between offshore platforms and vessels in the Gulf of Mexico.[28]

Because Gannard's tort claims against QPM as the employer of the crane operator similarly involve injuries to a platform worker during a personnel basket transfer between an offshore platform and a vessel, Gannard's claims against QPM are not maritime in nature and federal

---

[25] *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534, 115 S. Ct. 1043, 1048, 130 L. Ed. 2d 1024 (1995) (internal citation omitted).

[26] *Hicks*, 308 F. Supp. 3d at 890. The Court notes, however, that the court in *Hicks* only addressed the defendant's potential liability as the owner of the offshore platform, specifically declining to address the defendant's potential liability as a time charterer of the vessel at issue. *Id.* at 881 n. 1.

[27] *Id.*; *see also Willis v. Barry Graham Oil Serv. LLC*, 636 F. Supp. 3d 684, 695 (W.D. La. 2022).

[28] *See Davis v. Dynamic Offshore Res., L.L.C.*, 865 F.3d 235 (5th Cir. 2017) (applying Louisiana law in a case where a contractor was allegedly injured during a basket transfer between an offshore platform and a vessel); *Zepherin v. Conoco Oil Co.*, 884 F.2d 212 (5th Cir. 1989) (concluding that Louisiana's independent contractor defense shielded an offshore platform owner from liability where the contractor was allegedly injured during a personnel basket transfer between an offshore platform affixed to the Gulf of Mexico and a vessel).

maritime law does not govern them. Therefore, the Court concludes that Louisiana law, adopted as surrogate federal law under OCSLA, governs Gannard's tort claims against QPM.

### B. Whether QPM Breached a Duty Owed to Gannard.

Under Louisiana law, negligence cases are resolved by employing a duty/risk analysis, which entails five separate elements:

> (1) whether the defendant had a duty to conform his conduct to a specific standard (the duty element); 2) whether the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) whether the defendant's substandard conduct was a cause-in-fact of the plaintiff's injures (the cause-in-fact element); (4) whether the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) whether the plaintiff was damaged (the damages element).[29]

QPM contends that there is no evidence that it breached the duty of reasonable care owed to Gannard. Specifically, QPM argues that there is no evidence that the crane operator prematurely lifted and then dropped the personnel basket before Gannard had fully boarded. QPM also argues that the crane operator did not have a duty to anticipate or account for unpredictable wave conditions and that there is no evidence that the crane operator acted unreasonably in executing the personnel basket transfer.

The Court finds that there are at least two triable issues precluding summary judgment. First, there is a triable issue as to whether the QPM crane operator breached the duty of care by lifting and then dropping the personnel basket before Gannard had fully boarded. QPM and REC Marine dispute whether an email from Gannard's supervisor explaining that "the crane came up with the personnel basket off the boat when Russel wasn't 100% ready to go up"[30] can be

---

[29] *Hanks v. Entergy Corp.*, 944 So.2d 564, 579 (La. 2006).
[30] ECF No. 39-1 at 9.

7

considered as evidence for purposes of this motion because it was not based on the supervisor's personal knowledge. Even without this email, however, there is evidence in the summary judgment record establishing a genuine issue of material fact. Specifically, Gannard's witness statement written the day of the alleged accident states that the personnel basket "rose about 3' in the air and basket came slamming down jamming right knee. I was not all the way in the basket before it was lifted, was not fully boarded yet befor[e] it left the deck."[31] Based on this statement, a reasonable jury could determine that the QPM crane operator breached the duty of care by prematurely lifting and dropping the personnel basket before Gannard had fully boarded and that this action was the cause of Gannard's injuries. While Gannard later testified in his deposition that he did not think the crane operator prematurely lifted the basket,[32] the jury is tasked with determining credibility and weighing the evidence.

Second, there is a triable issue as to whether the QPM crane operator breached the duty of care by failing to leave adequate slack in the crane line to account for sea conditions. In his deposition testimony, the crane operator testified that he is required to leave slack in the cable attachment when placing the personnel basket down[33] and described the process for measuring the proper amount of slack to leave in the line.[34] While there is evidence that the general sea conditions on the day of the alleged incident were safe for a personnel basket transfer,[35] there is also evidence that the amount of slack in the crane line was insufficient to account for wave action at the time of Gannard's personnel basket transfer. The crane operator's deposition testimony indicates that when he accounted for slack on the day of the incident he may have only accounted for one to two foot

---

[31] *Id.* at 46.
[32] ECF No. 37-2 at 17-20.
[33] ECF No. 39-1 at 28-29.
[34] ECF No. 37-4 at 4.
[35] *See* ECF No. 37-2 at 14-15.

seas.[36] The Job Safety Environmental Analysis conducted prior to the operation, however, states that the seas were in the range of two to four feet.[37] A supervising operator, Harold Stutes, also testified that the seas were "a little rough that day."[38] Gannard testified that his best explanation of the incident is that "the boat came out from underneath us. A swell . . . . [W]e stayed stationary. The boat is the one that took off." [39] Other witnesses also testified to feeling a swell bring the Vessel downward.[40] Additionally, the Arena Report of Injury Evacuation states that the "Root Cause" of the incident was "[s]ea state and marine vessel movement (pitch, heave, and roll). The depth subsided by the M /V exceeded the excess wire rope offered to the transfer operation from the crane."[41] Based on this evidence, there is a triable issue as to whether Gannard's injuries resulted from the crane line having inadequate slack to account for wave action and that the crane operator bears responsibility in failing to leave sufficient slack.

In sum, there are triable issues as to whether the QPM crane operator breached the duty of care either by prematurely lifting and dropping the personnel basket before Gannard had fully boarded or by failing to leave adequate slack in the crane line to account for sea conditions. Thus, QPM's motion for summary judgment must be denied.

---

[36] ECF No. 39-1 at 32.
[37] *Id.* at 51.
[38] ECF No. 47-4 at 11-12.
[39] ECF No. 37-2 at 17-18.
[40] ECF No. 47-5 at 8; ECF No. 39-1 at 49-50.
[41] ECF No. 47-1 at 4.

## IV.
### REC MARINE'S MOTION FOR SUMMARY JUDGMENT

### A. Applicable Law.

In his complaint, Gannard asserts negligence claims under general maritime law and Section 905(b) of the Longshore and Harbor Workers Compensation Act. Both Gannard and REC Marine argue that general maritime tort law is applicable to the negligence claim against REC Marine, regardless of whether the claim is governed by maritime law or by Section 905(b).[42] While Gannard's claims against QPM as the employer of the crane operator are governed by Louisiana law (adopted as surrogate federal law under OCSLA), Gannard's claims against REC Marine as the owner of the Vessel are not necessarily governed by the same law.[43] The Court finds that, for purposes of resolving this motion, it is not necessary to determine which law applies. Specifically, whether the alleged incident occurred as a result of REC Marine's breach of a duty owed to Gannard is a threshold issue under either regime.[44]

---

[42] See Stevenson v. Point Marie, Inc., 697 F. Supp. 285 (E.D. La. 1988) (§ 905(b) claims arise under general maritime law).

[43] See Solet v. CNG Producing Co., 908 F. Supp. 375 (E.D. La. 1995) (finding that, in a case in which the plaintiff was injured during a personnel basket transfer, the plaintiff's claims against the owner of the fixed platform and employer of the crane operator were governed by OCSLA, whereas the claims against the vessel entities were governed by maritime law); Henson v. Odyssea Vessels, Inc., 2008 U.S. Dist. LEXIS 25221, 2008 AMC 2496 (E.D. La. Feb. 25, 2008) (reaching the same conclusion).

[44] See Canal Barge Co. v. Torco Oil Co., 220 F.3d 370, 376 (5th Cir. 2000) ("To establish maritime negligence, a plaintiff must demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury."); Hanks, 944 So.2d at 579 ("Under Louisiana jurisprudence, most negligence cases are resolved by employing a duty/risk analysis, which entails five separate elements: (1) whether the defendant had a duty to conform his conduct to a specific standard (the duty element); 2) whether the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) whether the defendant's substandard conduct was a cause-in-fact of the plaintiff's injures (the cause-in-fact element); (4) whether the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) whether the plaintiff was damaged (the damages element).").

**B. Whether REC Marine Breached a Duty Owed to Gannard.**

REC Marine argues that it did not owe Gannard a duty to warn him about a "rogue wave" and that Gannard has failed to come forward with evidence that REC Marine breached any duty owed to Gannard. Gannard argues, however, that REC Marine breached its duty of reasonable care when the REC Marine deckhand failed to instruct the crane operator to give more slack in the crane line to account for sea conditions and when he failed to inform personnel, including Gannard, that it was unsafe to board the personnel basket. It is undisputed that REC Marine owed Gannard a duty to exercise reasonable care.[45] The issue to be decided is whether a reasonable jury could find that the conduct of the REC Marine deckhand breached the duty of reasonable care and that this breach was a cause of Gannard's injuries.

The Court finds that there is a genuine issue of material fact warranting trial. As discussed in the previous section, a reasonable jury could find that the wave action at the time of Gannard's personnel basket transfer, paired with inadequate slack in the crane line, rendered the transfer unsafe. There is also evidence showing that the deckhand is responsible for communicating with the crane operator when more slack is needed in the crane line to account for sea conditions. The deckhand testified that part of his job is making sure that the crane line has the proper amount of slack[46] and that he uses hand signals to tell the crane operator if more or less slack is needed.[47] Harold Stutes testified that it is the responsibility of the deckhand to "flag or give hand signals to the crane operator in correspondence to the lift on the boat because he can see better than anyone

---

[45] Both Gannard and REC Marine agree that "a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew." *Kermarec v. Compagnie Generate Transatlantique*, 358 U.S. 625, 630, 79 S.Ct. 406, 409, 3 L.Ed.2d 550 (1959).
[46] ECF No, 47-3 at 12.
[47] *Id*. at 8.

else."[48] The deckhand's testimony indicates that the crane line would have insufficient slack only if he failed to communicate that more slack was needed:

> Q: Now for that to happen, for the vessel to drop away and come back up and hit the bottom of a personnel carrier—personnel basket—I'm gonna ask you if these things would be the only way it would happen: number one, the crane operator did not have enough slack in the line; am I correct?
>
> A: Yes.
>
> Q: And number two, you didn't tell the crane operator that he needed more slack in the line; am I correct?
>
> A: Yes.[49]

The deckhand also confirmed that he is responsible for informing basket passengers to wait if it is not safe to board the basket.[50] Gannard testified that during a transfer, "[y]ou depend on your deckhand to be your eyes and ears."[51] The deckhand explained that he is accustomed to the action of the waves and admitted that he is "in a superior position to have awareness of any danger in a lift more than a simple passenger."[52] He also testified that if someone was trying to get on the personnel basket before he wanted them to, he would stop them.[53] There is also evidence that the deckhand did not tell Gannard to wait before boarding the basket at the time of the incident. Harold Stutes testified that he witnessed the deckhand giving the personnel hand signals telling them to board the basket at the time of the incident[54] and the crane operator testified that he did not see Gannard rushing to board the basket.[55]

---

[48] ECF No. 47-4 at 7-8.
[49] ECF No. 47-3 at 14.
[50] *Id.* at 7 ("I tell them when to get on or when it's -- when they need to wait a minute.").
[51] ECF No. 44-3 at 21.
[52] ECF No. 47-3 at 9, 18.
[53] *Id.* at 16.
[54] ECF No. 47-4 at 8.
[55] ECF No. 47-5 at 7.

REC Marine argues, however, that there is no evidence that the deckhand could have detected dangerous wave action before the transfer began.[56] It contends that the deckhand cannot be expected to identify a dangerous wave condition when Gannard himself looked out over the water and did not see any rogue waves or swells before boarding.[57] The Court finds, however, that there is evidence from which a reasonable jury could determine that the deckhand could have taken action to prevent the dangerous transfer. The deckhand admitted that he is "in a superior position to have awareness of any danger in a lift more than a simple passenger."[58] The Quality Incident Investigation Report notes under "Communication" that "personnel basket transfer expectations could have been verbally communicated between the Crane Operator, Captain, and Deckhand . . . Ex. Verify the Crane Operator adjusts the slack in the line enough to compensate for the sea conditions and that the boat will hold position, prior to signaling the personnel to board the basket."[59] It also notes under "Stop Work Authority" that the deckhand "could have used SWA when the personnel rushed to board the basket."[60]

Further, there is evidence indicating that the deckhand was inexperienced at the time of the alleged incident. Gannard testified that "word gets around about this guy that—green hands . . . why wasn't he more active in his role, in his job. That's what I was thinking. Why didn't he let us

---

[56] *See Southard v. Paul Lester & Oregon Inlet Fishing Ctr., Inc.*, No. 2:05-CV-47-F(2), 2006 WL 8449039, at *5 (E.D.N.C. Oct. 12, 2006), aff'd sub nom. *Southard v. Lester*, 260 F. App'x 611 (4th Cir. 2008) (granting summary judgment when the plaintiff relied only on "sheer speculation and conjectural hypothesizing" to conclude that a vessel captain could have seen a "rogue wave" in advance of it colliding with the vessel); *Irwin v. United States*, 111 F. Supp. 912, 915 (E.D.N.Y. 1953), aff'd sub nom. *Irwin v. United States*, 236 F.2d 774 (2d Cir. 1956) (finding that the ship was not at fault for an accident caused by an unpredictable "freak swell" of the sea); *see also Hardy v. Wood Grp. PSN, Inc.*, No. 6:13-CV-00775, 2014 WL 1652530, at *3 (W.D. La. Apr. 24, 2014).

[57] ECF No. 44-3 at 21.

[58] ECF No. 47-3 at 9, 18.

[59] *Id.* at 4.

[60] *Id.*

know something?"[61] He continued, "I feel it was the—the deckhand's—it was his job. He—he just wasn't qualified, I think. He was just green . . . ."[62] Gannard also explained that he had "been working with him all week and seeing he was green."[63] The deckhand also testified that "nowadays when I—with more experience now, I—I try to be a little better at looking at my surroundings."[64]

In sum, there is a triable issue as to whether Gannard's alleged injuries were caused by inadequate slack in the crane line and that the deckhand bears responsibility for these injuries. Specifically, a reasonable jury could find that the REC Marine deckhand breached the duty of reasonable care by 1) failing to communicate to the crane operator that more slack was needed in the crane line to account for sea conditions and/or 2) failing to inform personnel, including Gannard, that wave action rendered the personnel basket transfer unsafe. REC Marine's motion for summary judgment is therefore denied.

## V.
### CONCLUSION

For the reasons set forth above, QPM's motion [ECF No. 37] is DENIED and REC Marine's motion [ECF No. 44] is DENIED.

THUS DONE in Chambers on this _____ day of June, 2026.

ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE

---

[61] ECF No. 44-3 at 25.
[62] *Id.* at 26.
[63] *Id.*
[64] ECF No. 47-3 at 23.

14